1

2

3

4

5

6               **IN THE UNITED STATES DISTRICT COURT**

7            **FOR THE EASTERN DISTRICT OF CALIFORNIA**

8

9  WILLIAM A. ROMERO,              No. CIV S-04-0459-MCE-CMK-P

10             Petitioner,

11      vs.                        <u>FINDINGS AND RECOMMENDATIONS</u>

12 D. RUNNELS,

13             Respondent.

14 _____/

15             Petitioner, a state prisoner proceeding pro se, brings this petition for a writ of

16 habeas corpus pursuant to 28 U.S.C. § 2254.   Pending before the court are petitioner's petition

17 for a writ of habeas corpus (Doc. 1), respondent's answer (Doc. 8), and petitioner's reply (Doc.

18 61).[1]

19                          **I.  BACKGROUND**

20      **A.      <u>Facts</u>**[2]

21             The state court recited the following facts, and petitioner has not offered any clear

22 _____

23      [1]      This action is related to <u>Fernandez v. Runnels</u>, E.D. Cal. case no. CIV S-04-0442-
   MCE-CMK-P (final judgment entered on November 28, 2006; no appeal filed).

24      [2]      Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made
   by a State court shall be presumed to be correct."  Petitioner bears the burden of rebutting this
25 presumption by clear and convincing evidence.  <u>See id.</u>  These facts are, therefore, drawn from
   the state court's opinion(s), lodged in this court.  Petitioner may also be referred to as
26 "defendant."

                                  1

and convincing evidence to rebut the presumption that these facts are correct:

The trial testimony, viewed in the light most favorable to the judgments, established the following facts. On January 28, 1999, two men kicked in the door of an apartment in the Southwood Estates apartment complex in Vacaville, where Cory Bonifacio and Ann Winston lived with their two children. Both Bonifacio and Winston and their children were home when the two men entered. Pepper, their two-year-old Rottweiler dog, was also in the house. One man, later identified as defendant Romero, wore a mask and carried a gun. The other man, later identified as defendant Fernandez, was not wearing a mask and was carrying a lead pipe.

Once in the kitchen of the apartment, Fernandez told Winston to get on the floor. Romero pointed his gun at the children and demanded money. He said, "[I]f you don't give me money, I will shoot your kids." When Bonifacio heard the noise, he came down to the kitchen. Romero pointed the gun at him and ordered him to get on the ground. In spite of the mask, Bonifacio immediately recognized Romero from his eyes, chin, and voice, having seen him twice before. Winston also recognized Romero's voice from a prior conversation she had with him in the neighborhood.

Once Bonifacio was on the ground in the kitchen, Fernandez hit him with his fist, and struck the dog in the head with the pipe. At some point, Fernandez pulled a gun out of his fanny pack and pointed it at Bonifacio, demanding that he give him money. Bonifacio took about $150 out of his pocket and Romero grabbed it.

Romero ran out of the door and Pepper chased after him. Fernandez also fled, but paused at the front door as if he were putting something into his fanny pack. When he paused, Bonifacio tackled him. While Bonifacio and Fernandez fought, Pepper had Romero pinned to the ground about 10 to 15 feet away. Romero's mask came off in the struggle and Fernandez clearly saw his face. Romero ran away with Pepper chasing him and Fernandez ran after them once he got away from Bonifacio. After defendants ran away, Winston and Bonifacio heard a single gun shot, and later they found Pepper dead with a gunshot wound in her chest. Winston and Bonifacio later identified Romero and Fernandez in photographic lineups.

Fernandez's wife, Gloria, eventually helped the police locate Fernandez and Romero in Colorado. Gloria testified that on January 26 she had rented Fernandez a U-Haul so he and Romero could move to Colorado where Fernandez's daughter, Desiree, lived. She and Fernandez had fought over the move, and that night she was arrested for domestic violence. When she was arraigned on January 28, Fernandez and Romero were present in the courtroom. By the time she was released that evening, however, Fernandez and Romero were gone and had taken all of her furniture. Gloria reported the theft to the police.

Rosie Aguayo, who had traveled with Romero and Fernandez to Colorado, testified that prior to leaving California, the U-Haul stopped at the Southwood Apartment Complex and Fernandez got out to see a friend. After about five minutes, she heard a noise that sounded like a backfire and then she heard a dog yelping. Shortly thereafter the U-Haul departed.

2

They arrived in Colorado two days later.

Investigators arrested Fernandez and Romero in Colorado and executed a search warrant for Desiree's house. The search turned up clothing that matched the descriptions of the clothing worn by the robbers on January 28th. Desiree testified at trial that the clothes seized from her house belonged to her. She also testified that Romero and Fernandez arrived at her house at about 11:00 p.m. during her anniversary party. She said her wedding anniversary is on January 28th. Gloria, however, testified that the anniversary, as recorded in her date book, is actually on January 30th.

Fernandez and Romero are father and son, respectively.

## B.  Procedural History

The state court recited the following procedural history through direct appeal:

Defendants Romero and Fernandez were charged by an amended information with first degree residential burglary in count one . . .; first degree residential robbery in counts two and three . . .; assault with a semiautomatic firearm in counts four, five, six, and seven . . .; and cruelty to an animal in count eight . . . . The amended information also alleged that both defendants used a firearm in the commission of the offenses . . .; that a principal in each of the above offenses was armed with a firearm. . .; and that Romero personally and intentionally discharged a firearm in the commission of the robbery. . . . On June 16, 2000, a jury found defendants guilty as charged. The jury found true all the firearm enhancement allegations against Romero, but found true only those enhancement allegations against Fernandez that did not require him to have been personally armed with a firearm. Defendants each filed a motion for a new trial that was denied.

Romero was sentenced to a total of 38 years in prison. The trial court sentenced him to the midterm of four years for first degree robbery, the midterm of two years for each of the four counts for assault with a semiautomatic firearm, and the midterm of eight months for cruelty to an animal. He was sentenced to an additional 25 years, 4 months for the firearm enhancements. Sentencing on all other counts and enhancement allegations was stayed . . . .

Fernandez was sentenced to a total prison term of 18 years. The trial court sentenced him to the midterm of one year four months for first degree robbery, the upper term of nine years for one count of assault with a semiautomatic firearm, the midterm of two years for each of the remaining three counts of assault . . ., and the midterm of eight months for cruelty to an animal. He was sentenced to an additional one year for the firearm enhancements. Sentencing on all other counts and enhancement allegations was stayed . . . .

Defendants' appeals were consolidated and the California Court of Appeal affirmed the

3

judgments and convictions in an unpublished opinion issued on November 18, 2002.  Fernandez

filed a petition for review in the California Supreme Court on December 20, 2002.  On December

31, 2002, petitioner Romero filed a separate petition for review joining in the arguments raised in

Fernandez' petition.  The California Supreme Court denied review without comment or citation

on February 11, 2003.  Petitioner Romero did not file any post-convictions actions in state court.

The instant federal petition was filed on February 9, 2004.


## II.  STANDARDS OF REVIEW

Because this action was filed after April 26, 1996, the provisions of the

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively

applicable.  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct.

(Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998).  The AEDPA

does not, however, apply in all circumstances.  When it is clear that a state court has not reached

the merits of a petitioner's claim, because it was not raised in state court or because the court

denied it on procedural grounds, the AEDPA deference scheme does not apply and a federal

habeas court must review the claim de novo.  See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir.

2002) (holding that the AEDPA did not apply where Washington Supreme Court refused to reach

petitioner's claim under its "re-litigation rule"); see also Killian v. Poole, 282 F.3d 1204, 1208

(9th Cir. 2002) (holding that, where state court denied petitioner an evidentiary hearing on

perjury claim, AEDPA did not apply because evidence of the perjury was adduced only at the

evidentiary hearing in federal court); Appel v. Horn, 250 F.3d 203, 210 (3d Cir.2001) (reviewing

petition de novo where state court had issued a ruling on the merits of a related claim, but not the

claim alleged by petitioner).  When the state court does not reach the merits of a claim,

"concerns about comity and federalism . . . do not exist."  Pirtle, 313 F. 3d at 1167.

Where AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d) is

not available for any claim decided on the merits in state court proceedings unless the state

court's adjudication of the claim:

>  (1) resulted in a decision that was contrary to, or involved an
>  unreasonable application of, clearly established Federal law, as determined
>  by the Supreme Court of the United States; or

>  (2) resulted in a decision that was based on an unreasonable
>  determination of the facts in light of the evidence presented in the State
>  court proceeding.

28 U.S.C. § 2254(d); see also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v.

Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F. 3d 1223, 1229 (9th Cir. 2001). Thus,

under § 2254(d), federal habeas relief is available only where the state court's decision is

"contrary to" or represents an "unreasonable application of" clearly established law. Under both

standards, "clearly established law" means those holdings of the United States Supreme Court as

of the time of the relevant state court decision. See Carey v. Musladin, 127 S.Ct. 649, 653-54

(2006). "What matters are the holdings of the Supreme Court, not the holdings of lower federal

courts." Plumlee v. Masto, 512 F.3d 1204 (9th Cir. Jan. 17, 2008) (en banc). Supreme Court

precedent is not clearly established law, and therefore federal habeas relief is unavailable, unless

it "squarely addresses" an issue. See Moses v. Payne, ___ F.3d ___ (9th Cir. Sept. 15, 2008)

(citing Wright v. Van Patten, 128 S.Ct. 743, 746 (2008)). For federal law to be clearly

established, the Supreme Court must provide a "categorical answer" to the question before the

state court. See id.; see also Carey, 127 S.Ct at 654 (holding that a state court's decision that a

defendant was not prejudiced by spectators' conduct at trial was not contrary to, or an

unreasonable application of, the Supreme Court's test for determining prejudice created by state

conduct at trial because the Court had never applied the test to spectators' conduct). Circuit

court precedent may not be used to fill open questions in the Supreme Court's holdings. See

Carey, 127 S.Ct. at 653.

In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a

majority of the Court), the United States Supreme Court explained these different standards. A

state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by

the Supreme Court on the same question of law, or if the state court decides the case differently than the Supreme Court has on a set of materially indistinguishable facts.  See id. at 405.  A state court decision is also "contrary to" established law if it applies a rule which contradicts the governing law set forth in Supreme Court cases.  See id.  In sum, the petitioner must demonstrate that Supreme Court precedent requires a contrary outcome because the state court applied the wrong legal rules.  Thus, a state court decision applying the correct legal rule from Supreme Court cases to the facts of a particular case is not reviewed under the "contrary to" standard.  See id. at 406.  If a state court decision is "contrary to" clearly established law, it is reviewed to determine first whether it resulted in constitutional error.  See Benn v. Lambert, 293 F.3d 1040, 1052 n.6 (9th Cir. 2002).  If so, the next question is whether such error was structural, in which case federal habeas relief is warranted.  See id.  If the error was not structural, the final question is whether the error had a substantial and injurious effect on the verdict, or was harmless.  See id.

State court decisions are reviewed under the far more deferential "unreasonable application of" standard where it identifies the correct legal rule from Supreme Court cases, but unreasonably applies the rule to the facts of a particular case.  See id.; see also Wiggins v. Smith, 123 S.Ct. 252 (2003).  While declining to rule on the issue, the Supreme Court in Williams, suggested that federal habeas relief may be available under this standard where the state court either unreasonably extends a legal principle to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply.  See Williams, 529 U.S. at 408-09.  The Supreme Court has, however, made it clear that a state court decision is not an "unreasonable application of" controlling law simply because it is an erroneous or incorrect application of federal law.  See id. at 410; see also Lockyer v. Andrade, 123 S.Ct. 1166, 1175 (2003).  An "unreasonable application of" controlling law cannot necessarily be found even where the federal habeas court concludes that the state court decision is clearly erroneous.  See Lockyer, 123 S.Ct. at 1175.  This is because ". . . the gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with

6

unreasonableness." Id. As with state court decisions which are "contrary to" established federal law, where a state court decision is an "unreasonable application of" controlling law, federal habeas relief is nonetheless unavailable if the error was non-structural and harmless. See Benn, 283 F.3d at 1052 n.6.

The "unreasonable application of" standard also applies where the state court denies a claim without providing any reasoning whatsoever. See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 233 F.3d 976, 982 (9th Cir. 2000). Such decisions are considered adjudications on the merits and are, therefore, entitled to deference under the AEDPA. See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 233 F.3d at 982. The federal habeas court assumes that state court applied the correct law and analyzes whether the state court's summary denial was based on an objectively unreasonable application of that law. See Himes, 336 F.3d at 853; Delgado, 233 F.3d at 982.

## III. DISCUSSION

Petitioner raises the following claims: (1) the trial court erred by denying his motion for a new trial based on juror misconduct; (2) the trial court erred in limiting CALJIC Nos. 2.01 and 2.02 to circumstantial evidence; (3) the trial court erred in instructing the jury pursuant to CALJIC No. 2.27; (4) the trial court erred by failing to instruct the jury pursuant to CALJIC No. 2.28 that an adverse inference would be drawn against the prosecution for not producing fingerprint evidence; (5) the trial court erred in instructing the jury pursuant to CALJIC No. 17.41.1; and (6) the evidence was insufficient to support the firearm enhancement.[3]

### A. Juror Misconduct Claims

Petitioner contends that the juror who eventually served as the foreperson

_____

[3]    The first three claims are identical to the claims raised by Fernandez in E.D. Cal. case no. CIV S-04-04420MCE-CMK-P. The remaining claims raised by petitioner Romero were not raised by Fernandez.

7

concealed during voir dire that her father-in-law had been the police chief of Fairfield, and that she had been friends with an elderly woman who had been murdered in a home invasion robbery. This information was presented to the trial court in the form of a declaration from petitioner's attorney filed in support of petitioner's motion for a new trial.

The Sixth Amendment guarantees a fair trial by an impartial jury. See Irvin v. Dowd, 366 U.S. 717, 722 (1961); Tinsley v. Borg, 895 F.2d 520, 523 (9th Cir.1990). If even a single juror is "unduly biased or prejudiced" the defendant has been denied his right to an impartial jury. See Tinsley,895 F.2d at 523-24. To establish misconduct in the context of failing to answer voir dire questions, petitioner must demonstrate that the juror failed to answer honestly, and that a correct response would have provided a basis for a challenge for cause. See McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556 (1984); Tinsley, 895 F.2d at 524. While the motives for concealing information may vary, only those reasons that affect a juror's impartiality can truly be said to affect the fairness of the trial. See id. Forgetfulness does not indicate lack of impartiality. See United States v. Edmond, 43 F.3d 472, 473-73 (9th Cir. 1994).

However, not every incident of juror misconduct or bias requires a new trial. See United States v. Klee, 494 F.2d 394, 396 (9th Cir. 1974). "The test is whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial." Id. On collateral review, if misconduct occurred, a petitioner must show that the alleged error "'had substantial and injurious effect or influence in determining the jury's verdict.'" Jeffries v. Blodgett, 5 F.3d 1180, 1190 (9th Cir. 1993) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)); see also Hughes v. Borg, 898 F.2d 695, 699 (1990).

In addressing this claim, the state court stated:

> Prejudicial jury misconduct constitutes grounds for a new trial. "When a party seeks a new trial based upon jury misconduct, a court must undertake a three-step inquiry. The court must first determine whether the affidavits supporting the motion are admissible under [California] Evidence Code section 1150(a). If the evidence is admissible, the court

must then consider whether the facts establish misconduct. Finally, assuming misconduct, the court must determine whether the misconduct was prejudicial." (citations omitted). "Intentional concealment of relevant facts or the giving of false answers by a juror during the voir dire examination constitutes misconduct, and the occurrence of such misconduct raises a rebuttable presumption of prejudice." (citation omitted). To determine whether the concealment gives rise to a presumption of prejudice, the trial court must "determine whether the question propounded to the juror was (1) relevant to the voir dire examination; (2) whether it was unambiguous; and (3) whether the juror had substantial knowledge of the information sought to be elicited." (citation omitted). "The presumption of prejudice created by the misconduct may be rebutted by '"... an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party resulting from the misconduct."'" (citations omitted).

* * *

       Initially, it is necessary to comment on the strength of defendant's showing. The People do not directly challenge the admissibility of counsel's declaration, presumably recognizing that the prosecution's failure to object to the competency of counsel's declaration in the trial court waived any challenge to its admissibility on appeal. (citation omitted). They do, however, fault defendants for not submitting a declaration from Juror No. 9, and point out that in the absence of such a declaration, we are not required to assume the truth of counsel's statements. Regardless of the prosecutor's failure to object to the declaration, the trial court had an independent obligation to carefully "examine the proffered basis for the new trial motion and determine whether credible and admissible evidence substantiates the underlying allegations." (citation omitted). Thus, the trial court could consider the absence of any foundation when evaluating the credibility of the declaration. The declaration fails to identify how counsel came to know the information he relates, leaving the trial court to resolve the motion based only upon unexplained allegations of defense counsel concerning matters about which he undoubtedly had no direct knowledge.

       Question number 11 on the juror questionnaire asked whether "a close friend or relative had been a victim of a crime?" Defendants submit that in response to this question Juror No. 9 intentionally concealed that she was a friend of Dorothy Stone, an 85-year-old neighbor who lived across the street from her father-in-law and who had been killed during a brutal home invasion robbery. The People argue that the allegedly concealed information was not responsive to the question asked during voir dire and that counsel's declaration does not establish that Juror No. 9 had knowledge of the allegedly concealed facts. Unfortunately, the People attempt to discredit defendants' showing by arguing that the concealed information was not responsive to a question that asked about a "friend/or relative being involved in a criminal case." Clearly, however, the People focus on the wrong question, and as a result never respond to defendants'

actual argument that Juror No. 9 denied knowing the victim of a crime, a separate and distinct voir dire question. Nonetheless, it is not at all clear that the allegedly concealed friendship was responsive to question number 11. The term "close friend" has no precise meaning, and the neighbor of one's father-in-law is not necessarily a close friend. If the attorney's declaration was correct that Juror No. 9 invited Ms. Stone to her wedding, this would provide some evidence of their relationship, but it would hardly be conclusive of a "close" friendship. Likewise, because the declaration does not indicate when Juror No. 9 was married or when the crime occurred, it is impossible to evaluate the depth of that relationship or the likelihood that the two remained in close contact prior to Ms. Stone's murder. Finally, while one might infer that Juror No. 9 had knowledge of the crime because the declaration recites it was widely publicized, that too is hardly conclusive. Because the declaration does not provide the source of the declarant's assertion that Juror No. 9 knew of the crime, the trial court was unable to weigh the reliability of that assertion. Accordingly, in light of the questionable value of the declaration before the court, the trial judge could reasonably conclude that there was insufficient evidence to justify a finding of misconduct.

Defendants' second contention suffers from similar defects. Juror No. 9 was asked whether "a friend or relative . . . is employed in the law enforcement capacity?" She responded that her sister is in the border patrol and a family friend is in the Vacaville Police Department. Defendants assert that this answer improperly concealed her father-in-law's prior employment with the Fairfield Police Department, demonstrating a bias in favor of law enforcement. The question, however, was asked in the present tense, so that the juror's failure to mention her father-in-law's former position as police chief did not render her answer literally wrong or incomplete. Even if this information should have been revealed, the juror's failure to mention it cannot realistically be regarded as indicative of bias in light of her disclosure of two other relationships with currently active law enforcement personnel and the additional disclosure that she had dinner the night before with a member of the Vacaville Police Department, the agency that investigated the crime being tried. Additionally, Juror No. 9 was asked and confirmed that she would not give greater weight to the testimony of police officers.

/ / /

Because the state court concluded that there was an insufficient evidentiary showing to establish misconduct, it did not reach the question of whether petitioner was prejudiced. Based on the state court's recitation of the applicable law, the court concludes that it applied the correct federal legal rules and, therefore, will review under the more deferential "unreasonable application of" standard.

In his pro se petition, petitioner asserts that the state court's analysis is flawed

because it did not take into account other questions asked of other jurors, which all jurors had been instructed to answer if applicable. Petitioner concludes that, because other questions asked during voir dire sought responses concerning any encounters with law enforcement, positive or negative, and past relationships with law enforcement, Juror No. 9 necessarily concealed information by not disclosing her knowledge of Ms. Stone's murder and her father-in-law's past employment as police chief. In this regard, respondent notes that, when Juror No. 9 was called to the jury box for voir dire, she was asked by the court whether she heard the questions asked of prior prospective jurors, to which Juror No. 9 responded that she had. When asked whether she wished to respond to any of those questions, Juror No. 9 said "No."

Assuming that petitioner is correct and Juror No. 9 should have disclosed her knowledge of Ms. Stone's murder and her father-in-law's past employment because other questions asked before Juror No. 9 entered the jury box sought such information, there is no evidence that Juror No. 9 failed to disclose the information for any reason which would reflect negatively on her ability to be impartial. For example, there is no evidence that Juror No. 9 intentionally concealed the information in order to get on the jury and then vote for conviction. Moreover, even though Juror No. 9 had current relationships with law enforcement personnel, she nonetheless assured the trial court that she could be fair and impartial and that she would not automatically give more weight to the testimony of a police officer. Therefore, disclosure of information concerning Ms. Stone's murder and her father-in-law's prior employment would not have provided cause for a challenge to Juror No. 9.

Based on the foregoing, the court finds that the state court's conclusion that no misconduct had been established was not an unreasonable application of federal law.

## B.    Jury Instruction Claims

Petitioner challenges the trial court's instructions pursuant to CALJIC Nos. 2.01, 2.02, and 2.27, 17.41.1. He also claims that the trial court erred in failing to instruct the jury regarding inferences which could be drawn from the prosecution's failure to present fingerprint

evidence.  A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of a transgression of federal law binding on the state courts.  See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  It is not available for alleged error in the interpretation or application of state law.  See Middleton, 768 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986).  Habeas corpus cannot be utilized to try state issues de novo.  See Milton v. Wainwright, 407 U.S. 371, 377 (1972).  Thus, a challenge to jury instructions does not generally give rise to a federal constitutional claim.  See Middleton, 768 F.2d at 1085) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).

However, a "claim of error based upon a right not specifically guaranteed by the Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so infects the entire trial that the resulting conviction violates the defendant's right to due process." Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th Cir. 1980)); see also Lisenba v. California, 314 U.S. 219, 236 (1941).  In order to raise such a claim in a federal habeas corpus petition, the "error alleged must have resulted in a complete miscarriage of justice."  Hill v. United States, 368 U.S. 424, 428 (1962); Crisafi v. Oliver, 396 F.2d 293, 294-95 (9th Cir. 1968); Chavez v. Dickson, 280 F.2d 727, 736 (9th Cir. 1960).

///

///

///

In general, to warrant federal habeas relief, a challenged jury instruction "cannot be merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due process right guaranteed by the fourteenth amendment."  Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988) (quoting Cupp v. Naughten, 414 U.S. 141, 146 (1973)).  To prevail, petitioner must demonstrate that an erroneous instruction "'so infected the entire trial that the resulting conviction violates due process.'"  Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Cupp,

414 U.S. at 147).  In making its determination, this court must evaluate an allegedly ambiguous jury instruction "'in the context of the overall charge to the jury as a component of the entire trial process.'"  Prantil, 843 F.2d at 817 (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir. 1984)).  Further, in reviewing an allegedly ambiguous instruction, the court "must inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution."  Estelle, 502 U.S. at 72 (quoting Boyde v. California, 494 U.S. 370, 380 (1990)).  Petitioner's burden is "especially heavy" when the court fails to give an instruction.  Henderson v. Kibbe, 431 U.S. 145, 155 (1977).  Where an instruction is missing a necessary element completely, the "reasonable likelihood" standard does not apply and the court may not ". . . assume that the jurors inferred the missing element from their general experience or from other instructions. . . ."  See Wade v. Calderon, 29 F.3d 1312, 1321 (9th Cir. 1994).  In the case of an instruction which omits a necessary element, constitutional error has occurred.  See id.

It is well-established that the burden is on the prosecution to prove each and every element of the crime charged beyond a reasonable doubt.  See In re Winship, 397 U.S. 358, 364 (1970).  Therefore, due process is violated by jury instructions which use mandatory presumptions to relieve the prosecution's burden of proof on any element of the crime charged.  See Francis v. Franklin, 471 U.S. 307, 314 (1985); see also Sandstrom v. Montana, 442 U.S. 510 (1979).  A mandatory presumption is one that instructs the jury that it must infer the presumed fact if certain predicate facts are proved.  See Francis, 471 U.S. at 314.  On the other hand, a permissive presumption allows, but does not require, the trier of fact to infer an elemental fact from proof of a basic fact.  See County Court of Ulster County v. Allen, 442 U.S. 140, 157 (1979).  The ultimate test of the constitutionality of any presumption remains constant –  the instruction must not undermine the factfinder's responsibility at trial, based on evidence adduced by the government, to find the ultimate facts beyond a reasonable doubt.  See id. at 156 (citing In re Winship, 397 U.S. at 364).

Even if there is constitutional error, non-structural errors may be harmless.  See

Hedgpeth v. Pulido, 129 S.Ct. 530, 532 (2008) (per curiam) (citing Chapman v. California, 386 U.S. 18 (1967)). In the context of jury instructions, an error is not structural so long as the error does not "vitiat[e] all the jury's findings." Sullivan v. Louisiana, 508 U.S. 275, 2781 (1993) (holding that an erroneous reasonable doubt instruction resulted in structural error not subject to harmless error analysis). An instructional error which resulted in omission of an element of the offense was a trial error subject to harmless error review. See Hedgpeth, 129 S.Ct. at 532 (citing Neder v. United States, 527 U.S. 1 (1999)). An erroneous aider and abettor instruction is also not structural. See id. (citing California v. Roy, 519 U.S. 2 (1996) (per curiam)). A jury instruction which misstates an element of an offense is also not structural. See id. (citing Pope v. Illinois, 481 U.S. 497 (1987)). An erroneous burden-shifting instruction is also not structural. See id. (citing Rose v. Clark, 478 U.S. 570 (1986)). Finally, an instruction on multiple theories of guilt where one of the theories is improper does not result in a structural error requiring automatic reversal but is error subject to harmless error analysis. See id.

In Chapman, a case before the Supreme Court on direct review, the Court held that "before a [non-structural] constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." 386 U.S. at 24. A different harmless error standard applies to cases on collateral review. In Brecht v. Abrahamson, the Court stated that applying the Chapman standard on collateral review "undermines the States' interest in finality and infringes upon their sovereignty over criminal matters." 507 U.S. 616, 637. The Court also noted that the Chapman standard is at odds with the historic meaning of habeas corpus – which is meant to afford relief only to those who have been grievously wronged – because it would require relief where there is only a reasonable possibility that a constitutional error contributed to the verdict. See id. Therefore, in habeas cases, the standard applied in Kotteakos v. United States, 328 U.S. 750 (1946), governs harmless error analysis for non-structural constitutional errors. See Brecht, 507 U.S. at 637. Under this standard, relief is available where non-structural error occurs only where such error "had a substantial and injurious

effect or influence in determining the jury's verdict." <u>Kotteakos</u>, 328 U.S. at 776.

1.  <u>CALJIC Nos. 2.01 and 2.02</u>

The trial court instructed the jury pursuant to CALJIC No. 2.01 as follows:

> [A] finding of guilt as to any crime may not be based on circumstantial evidence unless the proved circumstances are not only, one, consistent with the theory that the defendant is guilty of the crime, but, two, cannot be reconciled with any other rational conclusion. Further, each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance on which the inference necessarily rests must be proven beyond a reasonable doubt.
> Also, if the circumstantial evidence as to any particular count permits two reasonable interpretations one that point to the defendant's guilt and the other to his innocence, you must adopt that interpretation that points to the defendant's innocence and reject that interpretation which points to his guilt.
> If, on the other hand, one interpretation of this evidence appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable.

The court also instructed the jury pursuant to CALJIC No. 2.02:

> The specific intent with which an act is done may be shown by the circumstances surrounding the commission of the act. However you may not find the defendants guilty of the crimes charged in Counts 1, 2, and 3 unless the proved circumstances are not only consistent with the theory the defendant had the required specific intent, but cannot be reconciled with any other rational conclusion.
> Also, if the evidence as to any specific intent permits two reasonable interpretations, one of which points to the existence of the specific intent and the other to its absence, you must adopt that interpretation which points to its absence.

> If, on the other hand, one interpretation of the evidence as to specific intent appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable.

In addressing petitioner's claim concerning these jury instructions, the state court stated:

> Defendants contend that the trial court erred in limiting to circumstantial evidence the principle that if evidence is susceptible to two reasonable interpretations, then the jury must reject the interpretation that

15

points to defendants' guilt.  Defendants argue that this general principle is applicable to direct evidence as well as circumstantial evidence and that CALJIC Nos. 2.01 and 2.02 improperly limit its application to circumstantial evidence only.  Defendants' argument lacks merit.

First, CALJIC Nos. 2.01 and 2.02 apply only to circumstantial evidence and, in fact, should not be given where the prosecution relies primarily on direct evidence of a defendant's guilt.  (citation omitted).  Moreover, an additional instruction applying the principle contained in CALJIC Nos. 2.01 and 2.02 to direct evidence would make no sense.  Direct evidence "means evidence that directly proves a fact, without an inference or presumption, and which in itself, if true, conclusively establishes that fact." (citation omitted).  There is no room for inference or interpretation of direct evidence warranting an instruction that the defendant should be given the benefit of any reasonable interpretation that points to his or her innocence.  Accordingly, the trial court did not err in this regard.

The state court did not directly address whether CALJIC Nos. 2.01 and 2.02 reduce the prosecution's burden of proof.  While it indirectly did so by holding these instructions would not make any logical sense in the context of direct evidence, the state court did not explicitly address the issue.  Therefore, this court will assume the state court applied the correct law and review to determine whether the state court's decision was objectively unreasonable.

First, as the state court observed, there is no logical room for the concept embodied in CALJIC Nos. 2.01 and 2.02 in the context of direct evidence because such evidence is not susceptible to inference or differing interpretations.  It is what it is – evidence directly establishing a fact.  Therefore, it cannot be said that limiting the concept to circumstantial evidence – where is makes sense logically – reduced the prosecution's burden of proof on any essential element of a charged offense.  Second, other instructions given at the trial make clear that the jury understood its obligation to find guilt beyond a reasonable doubt and that the prosecution carried the burden of proof.  Specifically, the trial court instructed the jury as follows:

A defendant in a criminal action is presumed to be innocent until the contrary is proved.  And in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty.  This presumption places upon the People the burden of proving him guilty beyond a reasonable doubt.

1    For these reasons, the court concludes that there was no constitutional error with

2   respect to the trial court's instructions pursuant to CALJIC Nos. 2.01 or 2.01.  Therefore, the

3   state court's determination was not objectively unreasonable.

4        2.    CALJIC No. 2.27

5        In addressing petitioner's claim as to this instruction, the state court stated:

6            CALJIC No. 2.27 reads as follows: "You should give the
         [uncorroborated] testimony of a single witness whatever weight you think
7        it deserves.  Testimony by one witness which you believe concerning any
         fact [whose testimony about that fact does not require corroboration] is
8        sufficient for the proof of that fact.  You should carefully review all the
         evidence upon which the proof of that fact depends."  The court instructed
9        the jury with CALJIC No. 2.27 in full.  The Use Note to CALJIC No. 2.27
         provides that the bracketed phrases should be used when "corroboration of
10       witness's testimony is required, such as in [perjury cases]. . . .  None of the
         charged crimes or defendants in this case required corroboration, but the
11       trial court nonetheless included the bracketed phrases in the instruction.
             Defendants contend that the trial court erred because the references
12       to corroboration in the instruction misled the jury to believe that "they
         should 'carefully review' the testimony of a single witness and could find
13       it insufficient if 'uncorroborated.'" Defendants assert that this error was
         prejudicial because only one witness testified that defendants were in
14       Colorado on January 28, 1999, the day that the crimes were committed in
         California.
15           Arguably, the trial court should have eliminated the bracketed
         language from this instruction.  There is, however, no indication in the
16       record that the jury had any questions regarding whether the testimony of
         any witness in this case required corroboration.  Absent a requirement for
17       corroboration, the instruction merely tells the jury that a single witness's
         testimony is sufficient if believed, and that they should consider the
18       evidence in support of that testimony carefully.  The possibility that the
         jury was confused by this instruction is remote, and it is even less likely
19       that any prejudice arose from the potential confusion.  Desiree's testimony
         that defendants arrived in Colorado on her anniversary conflicted with
20       Gloria's testimony that defendants were in California on the morning of
         the 28th and is inconsistent with the victims' identification of Fernandez
21       and Romero as the two men who broke into their home.  Thus, it is likely
         that the jury rejected Desiree's testimony, not because it was
22       uncorroborated, but because it was in conflict with the credible testimony
         of three other witnesses.  Accordingly, it is not reasonably probable that
23       the jury would have reached a result more favorable to defendants had the
         bracketed portions of the instruction been deleted.

24

25  While the state court concluded that the jury was probably not confused by CALJIC No. 2.27, as

26  given, it did not specifically address whether the instruction reduced the prosecution's burden on

                                           17

an essential element.  Therefore, as with CALJIC Nos. 2.01 and 2.02, this court will assume the state court applied the correct law and review to determine whether the state court's decision was objectively unreasonable.

The state court is correct.  There was no testimony in this case which required corroboration.  Therefore, there could have been no reasonable chance of jury confusion. Further, there is nothing in the instruction which could arguably reduce the prosecution's burden on an essential element.  For these reasons, the court concludes that petitioner's claim lacks merit.  The state court's determination was not objectively unreasonable.

### 3. CALJIC No. 17.41.1

As to this instruction, the California Court of Appeal stated:

> Defendants contend it was error to instruct the jury in accordance with CALJIC No. 17.41.1 as follows: "The integrity of a trial requires that jurors, at all times during their deliberations, conduct themselves as required by these instructions.  Accordingly, should it occur that any juror refuses to deliberate or expresses an intention to disregard the law or to decide the case based on penalty or punishment, or any other improper factors, it is the obligation of the other jurors to immediately advise the Court of the situation."  Defendants suggest that the reading of CALJIC No. 17.41.1 denied them a fair trial by compromising the private and necessarily uninhibited character of jury deliberations.
> The California Supreme Court recently reviewed this issue, concluding the instruction intrudes unnecessarily into the deliberative process.  The court affirmed the defendant's conviction in that case, finding no evidence of prejudicial error, but advised that the instruction not be given in criminal cases in the future.  (citation omitted).  Nowhere in this record is it suggested that any juror refused to follow the law or that the challenged instruction had any impact on the deliberations. Accordingly, any error resulting from the giving of this instruction was harmless beyond a reasonable doubt.  (citation omitted).

As respondent notes, this exact claim was discussed by the Ninth Circuit in Brewer v. Hall, 378 F.3d 952 (9th Cir. 2004).  The court rejected the claim, stating: "It is clear . . . that the California appellate court's holding was not contrary to or an unreasonable application of clearly established Supreme Court precedent, because no Supreme Court case establishes that an instruction such as CALJIC 17.41.1 violates an existing constitutional right."  Id. at 955-56.  As in Brewer,

1  petitioner is not entitled to habeas relief on this claim because there is no clearly established law.

2      4.    CALJIC No. 2.28

3          At trial, defendants requested that the court instruct the jury pursuant to CALJIC

4  No. 2.28 that an adverse inference could be drawn against the prosecution for failing to produce

5  or preserve fingerprint evidence. Petitioner claims the trial court's refusal to give this instruction

6  violated his right to due process. As to this claim, the California Court of Appeal stated:

7          Defendants contend that the trial court erred by not instructing that
an adverse inference could be drawn against the prosecution for failing to

8  produce physical evidence of latent fingerprints lifted from the crime scene
and failing to preserve the fingerprint evidence. At the end of trial,

9  defendants requested CALJIC No. 2.28, which the court refused to give.
(footnote omitted). Defendant's motions for new trial were also based on

10  the court's refusal to give CALJIC No. 2.28 or a similar instruction. The
People argue that an adverse inference instruction was not warranted

11  because the District Attorney's office was unaware of the possible
existence of unprocessed fingerprints until a police officer testified on

12  cross-examination that he may have lifted some prints, and that even if the
instruction should have been given, no prejudice resulted because the

13  defendants were not prohibited from arguing that the prosecution's case
was based on poor police work.

14          On direct examination, Officer Raymond testified that he
processed the crime scene for fingerprints by dusting the kitchen

15  countertop and cabinet area. He found a few prints that he attempted to
lift, but the prints were no smudged that the ridges were indistinguishable.

16  As a result, he had nothing to take back to the evidence technician. On
cross-examination, however, Officer Raymond testified that he attempted

17  to lift some prints off the countertop and cabinet in the kitchen, put the
prints on an evidence card and processed the card with the other evidence.

18  He either booked the card into evidence or attached it with his report, but
he believed he assigned the card a number and placed it in the evidence

19  locker on the assumption that an evidence technician would process it. In
response to defendants' motion for new trial, the prosecutor argued that

20  "[i]t was not until Officer Raymond's testimony during the second trial, 1
½ years after the incident, that he states he thinks he remembers lifting

21  some latent prints. No print cards from the crime scene were ever logged
into evidence, or ever proven to be existence with the exception of Officer

22  Raymond's faulty memory. The People did not introduce any print
evidence from the scene at trial to try to establish identity."

23          Defendants argue that the trial court erred in refusing to give an
adverse inference instruction because the prosecution's failure to disclose

24  the existence of fingerprint evidence violated criminal discovery laws
(section1054.1) and implicated his due process rights under *Brady v.*

25  *Maryland* (1963) 373 U.S. 83 (*Brady*). Section 1054.1 requires the
prosecuting attorney to disclose to the defendant or his or her attorney all

26  relevant real evidence seized or obtained as a part of the investigation of

the offenses charged, if it is in the possession of the prosecuting attorney or if the prosecuting attorney knows it to be in the possession of the investigating agencies. Here, Officer Raymond's testimony regarding the existence of the fingerprint card is inconsistent. First he testified that no fingerprint evidence was recovered and returned to the evidence technician. Then he testified that he either placed a fingerprint card in the evidence locker or attached it to his report. Assuming that such a card existed, there is no evidence that the prosecutor knew or should have known of the evidence because, as the prosecutor indicated, no cards were ever logged into evidence. Under these circumstances, the trial court did not abuse its discretion by refusing to instruct the jury that an adverse inference could be drawn as a sanction for the prosecution's purported discovery abuse. (footnote omitted).

Moreover, the failure of the prosecutor to disclose the possible existence of fingerprint evidence did not violate defendants due process rights. In *Brady*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (*Brady*, *supra*, 373 U.S. at p. 87). "The scope of a prosecutor's disclosure duty includes not just exculpatory evidence in *his* possession but that possessed by investigative agencies to which he has reasonable access." (citation omitted). Evidence, for the purpose of the duty to disclose, is material "only if there is a reasonable probability that, had [it] been disclosed to the defense, the result of the proceeding would have been different." (citation omitted). Evidence is "favorable" if it either helps the defendant or hurts the prosecution, as by impeaching one of its witnesses. (citation omitted). Thus, to prevail on this claim, defendants "must show both the favorableness and the materiality of any evidence not disclosed by the prosecution. . . ." (citation omitted). Defendants did not meet this burden. Assuming the fingerprint card existed, Officer Raymond's testimony was undisputed that the prints were smudged and most likely unreadable. Any conclusion that the prints would have proved that defendants were not the perpetrators of these crimes would be pure speculation. (citation omitted). Accordingly, defendants' due process rights were not violated.

Finally, defendants' argument that they were entitled to an adverse inference instruction based on the prosecutor's failure to preserve the fingerprint evidence is similarly without merit. In *California v. Trombetta* (1984) 467 U.S. 479, the United States Supreme Court held that "[w]hatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality [citation], evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*Id*. at pp. 488-489, fn. omitted). The unprocessed fingerprint evidence had no exculpatory value that was apparent to the prosecution prior to the time it was lost. Accordingly, the trial court did not abuse its discretion in failing to instruct the jury that they could draw an adverse inference from the lost

1       fingerprint evidence, or in denying the motions for new trial based on this
2       same argument.

3  As the state court observed, even if the fingerprint evidence existed, there is no evidence the

4  prosecution knew of it because no such evidence was ever logged.  Therefore, there was never

5  any duty on the part of the prosecution to produce fingerprint evidence and, for this reason, an

6  instruction regarding an inference for failing to do so would not have been warranted.  In

7  addition, petitioner's case was not rendered unfair as a result of failure to give CALJIC No. 2.28.

8  In essence, the officer's inconsistent testimony regarding the fingerprints suggests potentially

9  sloppy police work, an argument which petitioner was free to make in his defense.  Thus, even

10 though the jury was not specifically instructed that it could draw an adverse inference, defendant

11 could have argued that the prosecution's case was undermined by sloppy police work.

12      For these reasons, the court finds that the state court's determination was neither

13 contrary to nor an unreasonable application of any clearly established law.

14 **C.**     **Sufficiency of the Evidence**

15      Petitioner argues that the evidence was insufficient to support the firearm

16 enhancement.  When a challenge is brought alleging insufficient evidence, federal habeas corpus

17 relief is available if it is found that, upon the record of evidence adduced at trial, viewed in the

18 light most favorable to the prosecution, no rational trier of fact could have found proof of guilt

19 beyond a reasonable doubt.  See Jackson v. Virginia, 443 U.S. 307, 319 (1979).[4]  Under Jackson,

20 the court must review the entire record when the sufficiency of the evidence is challenged on

21 habeas.  See id.  It is the province of the jury to "resolve conflicts in the testimony, to weigh the

22

23      [4]    Even though Jackson was decided before AEDPA's effective date, this expression
of the law is valid under AEDPA's standard of federal habeas corpus review.  A state court
24 decision denying relief in the face of a record establishing that no rational jury could have found
proof of guilt beyond a reasonable doubt would be either contrary to or an unreasonable
25 application of the law as outlined in Jackson.  Cf. Bruce v. Terhune, 376 F.3d 950, 959 (9th Cir.
2004) (denying habeas relief on sufficiency of the evidence claim under AEDPA standard of
26 review because a rational jury could make the finding at issue).

evidence, and to draw reasonable inferences from basic facts to ultimate facts." Id. "The question is not whether we are personally convinced beyond a reasonable doubt. It is whether rational jurors could reach the conclusion that these jurors reached." Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991); see also Herrera v. Collins, 506 U.S. 390, 401-02 (1993). The federal habeas court determines sufficiency of the evidence in the context of the substantive elements of the criminal offense, as defined by state law. See Jackson, 443 U.S. at 324 n.16.

Petitioner's sentence was enhanced pursuant to California Penal Code § 12022.53(c) based on the jury's finding that he personally and intentionally used a firearm in the commission of the robbery. In particular, the jury found that petitioner shot and killed the dog, Pepper. Petitioner contends that the evidence was insufficient ". . . for a rational jury to conclude that petitioner, and not Fernandez, shot the dog." He states that "there were no witnesses or physical evidence to determine which suspect fired his weapon."

In rejecting petitioner's claim, the state court concluded:

> Here, Winston testified that Romero ran out of the house with Pepper right behind him. At that time, he still had the gun in his hand. Fernandez followed Pepper out of the house. Bonifacio testified that when Fernandez paused at the door to put something in his fanny pack, he grabbed him from behind and they fought. Fernandez did not have a gun out when they were fighting. While they were fighting, Bonifacio saw Pepper on top of Romero with his mask off, and Romero was yelling "Get the dog off me." Romero got away from Pepper and tried to run away. Pepper ran after him. Then, Fernandez got away from Bonifacio and ran after Pepper and Romero. Winston testified that she heard a single gun shot, and later Pepper was found dead, after being shot once in the chest. While there were no witnesses to the actual shooting, based on the evidence of the order in which they fled from the house and the fact that the dog was shot in the chest, it is reasonable to infer that Romero shot Pepper. Moreover, the jury rejected the allegations that Fernandez personally used a gun in the commission of these crimes, thereby leaving Romero as the sole possible shooter. Substantial evidence supports the verdict.

The court finds that the state court's logic is unassailable. Viewing the circumstantial evidence in the light most favorable to the prosecution, it is clear that a rational jury could have concluded that Romero shot Pepper, particularly in light of the jury's specific finding that Romero, and not

Fernandez, personally used a firearm. One gun shot was fired and the jury concluded that it was not fired by Fernandez. That only leaves Romero as the shooter. Moreover, the evidence indicates that the dog was attacking Romero, not Fernandez. This is also sufficient evidence upon which a rational jury could conclude that Romero shot the dog.

The state court's determination was neither contrary to nor an unreasonable application of clearly established law.

## IV. CONCLUSION

Based on the foregoing, the undersigned recommends that petitioner's petition for a writ of habeas corpus (Doc. 1) be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within 20 days after being served with these findings and recommendations, any party may file written objections with the court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Failure to file objections within the specified time may waive the right to appeal. See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: May 21, 2009

CRAIG M. KELLISON
UNITED STATES MAGISTRATE JUDGE